case number 19-1233 et al. Great Lakes Communications Corp et al petitioners versus Federal Communications Commission and United States of America. Ms. Coppola for the joint petitioners, Mr. Carr for the respondents. Good morning Ms. Coppola, you can proceed. May it please the court, Lauren Coppola for joint petitioners. Petitioners ask the court vacate the FCC's 2019 order on access stimulation. Respectfully, this court call demonstrates one of the core reasons why this order should be vacated. Currently, we are all on Zoom's platform. Zoom is a high-volume conferencing application that generates enormous amounts of terminating call traffic, offers a free service, and was recently lauded by the commission as an essential service for the public in the COVID-19 crisis. If we were all to dial into this call using phone audio, we would dial a telephone number with a 646 area code, a telephone number connected by a competitive local carrier located in New York, New York. That urban carrier that connects this call is paid access charges by other carriers to do so. However, if this very same call were connected by a small, rural, competitive local carrier such as Petitioner Northern Valley here, this call would be slapped with an access stimulation label. And worse, under the commission's 2019 order, petitioners would have to pay the cost to connect this call. The economics are entirely reversed. Now, the commission and long-distance carriers would have you believe that access stimulation traffic is synonymous with sexually explicit chat lines, and the record and the order is filled with overheated and misleading inflammatory statements. But this is a smokescreen, a diversion to mask the commission's disparate treatment of carriers connecting the same exact calls. And with this order, the commission is picking winners and losers in the marketplace. It is restricting and steering the output of a service. The commission's 2019 order is tantamount to adjudication against a small group of carriers that's disguised as roommate, really, without the procedural safeguards of adjudications for the party's impact. The FCC admits in its briefing that the commission reasonably decided to focus on carriers that are engaging or have engaged in access stimulation. It's an outcome-based rule, a tautology, in fact. Are you saying, counsel, that there's something improper with the commission regulating and discouraging access stimulation? I mean, hasn't that ship already sailed? The commission is free to regulate access stimulation, Your Honor, but it has to do so in a lawful manner. And the key here is the commission used an unlawful rule for a lawful means, and it simply can't do that. And what I mean by that is the rule erases the congressional mandate for reciprocal compensation and thus must be vacated. So Section 251B of the Telecommunication Act requires that carriers provide reciprocal compensation. And instead, the commission's order, which obliterates the word reciprocal, it disregards the establishment of universal billing keep and creates a special rule just for the targeted carriers here, buy and give away. Why do you say it's, first of all, the FCC relies primarily on the statutory provision that allows them to prevent unreasonable charges, number one. Number two, why do you say it's not reciprocal? After all, if you're making a bloody fortune receiving calls, but not responding with equal revenue on making calls, why is that reciprocal? Well, here, Your Honor, there is no reciprocal compensation between the carriers. On each call? Is that what you mean? That's what I mean. That's what I mean. But if you group the calls together, it's reciprocal, isn't it? It is not, because one carrier has not only to pay to connect calls, it also has to pay to send calls, whereas the long distance carrier here gets paid both ways. And the commission does rely on Section 201B of the Act, but it cannot create an unlawful rule to achieve a lawful means. And so, because the commission exceeded its statutory authority, this rule, this order must be vacated. It should also be vacated, Your Honors, because the order is beyond repair and the deficiencies in it are fatal, as in there is no rational connection between the harm that the FCC is allegedly solving for and the rule. Consumer harm. The best the commission does is cite self-serving allegations of the long distance carriers, of harm that these long distance carriers allegedly incurred. But by the time the commission issues its 2019 order, it abandons public interest here and says in paragraph 32 of the order that the commission's reversal of economics is warranted, regardless, regardless of how the long distance carriers use their cost savings, and instead looks to pass on the savings to the incumbent carrier shareholders. There is nothing in the pro-competitive telecommunications act that permits favoring a carrier shareholders over a consumer's choice of services in the market here. And so, the commission drafted a rule favoring the long distance carrier shareholders and putting anti-competitive blocks in place against a group, a small group of carriers. Forgive me, counsel, but since the inter-exchange market is competitive, and if there's a reduction in the cost for the inter-exchange carrier because of the rule reducing access charges at your end, isn't it, if it's a competitive market, isn't it almost certainly true that part of the benefits of that will be passed on to consumers? Your honor, the commission would like you to believe that, but we have no data demonstrating that that is true. Actually, I learned that in college. I understand, your honor, and economic theory would make as much sense. However, here there's no data, and here we had eight years. So, in 2011, the commission instituted the cap, the transformation order, and we had nearly a decade's worth of data to look at to see if it was really true that the cost savings along distance carriers derived from the reduction in access charges were actually passed on to consumers. And there is no data in the record that such savings were passed on to consumers. And I will refer you again, Judge Silberman, to the commission pointing to the profits to the long distance carrier shareholders. Even if that were true, that would also redound to the benefit of consumers ultimately, since the corporation would have more money to invest in modern technology. And it may, and the commission does have the ability to consider public interest. But here again, you cannot do so by instituting an unlawful rule, a rule that eviscerates reciprocity and uniformity. And I'd like if your honors has- But Ms. Coppola, so, I mean, the commission, of course, must treat similarly situated parties similarly, but here, hasn't the commission given, haven't they given adequate reasons for their different treatment? I mean, you've repeatedly said that it's unlawful because of the reciprocity point, but what about the commission's reasons for why they are treating the carriers differently? Well, the commission's reasons are not, there aren't really any, they aren't tied to logic. And they create a rule to look at the 21 carriers who they contend are engaged in access stimulation. Excuse me, just a moment, counsel. I'm perhaps getting confused. I thought when you were talking about reciprocity, you were talking about the relationship between the competitive carriers and the long distance carriers. That was your reciprocity point, not the relationship between the competitive carriers and the rate of return carriers. Is that correct? You're correct. You're correct, Judge Silverman. You have a separate argument that the rate of return carriers are being favored over the competitive carriers. That's a separate argument, right? That's correct. And that can be demonstrated, Judge Silverman, by the commission's last change of this rule. So getting back to Judge Rao's question, there is no reasonable or logical connection between the change of rules. So between the draft order and the final order, the incumbent rurals advocated for a different rule just for them. And in doing so- Now you're going to the notice question, right? I'm also going to the rational basis. Let's take them apart. The notice question bothered me. I thought you made an interesting argument. But suppose the FCC had done nothing, whatever, with respect to the rate of return carriers and had simply imposed the six to one ratio and the other requirements on transport and switching on your clients. Suppose that had been done. Wouldn't that have been perfectly in accordance with the notice of proposed rulemaking? Well, Your Honor, I think it would have helped fix one of the problems. But again, you'll remember in the notice of proposed rulemaking, the FCC proposed an inversion or a reversion of the economics as an alternative to accepting direct connections. Carriers either accept the financial responsibilities or can avoid doing so by offering the direct connection. Well, I was just asking about the notice question, the logical output of the argument and giving you the hypothetical. Suppose instead of a 10 to one ratio for the rate of return carriers, the FCC had ignored altogether the rate of return carriers. That would still, that would have been perfectly consistent with a notice. Now, you still have an argument whether that would be fair or arbitrary and capricious, but it would certainly have been consistent with a notice, right? That's correct on that limit. So if that's true, why is the 10 to one ratio any different? If they could have ignored the rate of return carriers altogether with respect to the notice, then why the 10 to one makes any difference? The 10 to one demonstrates that the commission is treating similarly situated- That goes to the merits of the argument, not the notice question. I'm only focused on the notice. You with me? Yes, Judge. Okay. So that hypothetical seems to me to undermine your position. Now, with respect to the more substantive question, whether it's reasonable to treat the competitive carriers different from the rate of return carriers. What about the government's argument that the rate of return carriers structurally are in a different position? They don't have anywhere the flexibility of the competitive carriers because they have a big footprint. So they can't move as rapidly and come up with various, what the government calls gimmicks to accentuate their access charges. Well, I don't think that reasoning is grounded in the record, Your Honor. And moreover, it again appears that the commission is arbitrarily picking good terminating traffic versus bad terminating traffic. So you'll see in the record, there's a reference to that rate of return carriers have a lot of terminating call centers. So the commission is saying, well, we like high volume terminating calls if they're call centers, but not conferencing. So, and you're providing the rate of, with the difference in the 10 to one and six to one, you're providing rate of return carriers, the ability to make a profit when it connects this Zoom calls and petitioners cannot. Only 4% of the rate of return carriers had arguably access charges. Your Honor is referring to a statement in the commission's So then that point, Your Honor demonstrates that the rule is a tautology. A access simulator is an access simulator is an access simulator. And that is not reasonably tied to one fixing any public harm or two to any reasonable basis to target a group of carriers here. The commission has the but it cannot do so through unlawful rules that are race reciprocity and that do away with the notion of a universal, a universal billing key system. And I counsel that gets me to another question. I have to confess. I had a devil of a time understanding the network edge problem. Would you explain it pretty simply? Absolutely, Your Honor. I'll say it even as simply as I can, which is that the FCC has been inconsistent on its position in the network edge. It's been all over the place in this docket. At one point, the order seems to place the network edge at the, for the local exchange carriers that are engaged in access stimulation. I thought they hadn't really decided the network edge. You're right, Your Honor. It's still up in the air. You're right, Your Honor. It is. But because of the way, the implications of the order, which mandates the tandem point as the payment point, it creates, it could create a network edge here. It could, but not necessarily. And if it did, the commission needs to explain it's why it's deviating from prior positions where setting a network edge. That reminds me of my favorite line. If my aunt had wheels, she'd be a trolley car. Because it's still up in the air. Well, I would submit, Your Honor, that on our papers, we demonstrate that the order sets it for these access stimulating lacks. And we should not, again, this is another example of the commission setting an interim rule just for local exchange carriers when it hasn't done its job on network edge or moved us all to bill and keep. But special interim rules are slapped on access stimulators. And thus, the order should be vacated. Now, CMO, over my time. Are there any further questions from the panel? No. Thank you. All right. We'll give you some time on rebuttal, Ms. Coppola. And we'll hear from counsel for the FCC, Mr. Carr. Good morning, Your Honors. May it please the court, my name is James Carr. I represent the Federal Communications Commission. Let me start with petitioner's argument that they feel that they are being singled out here by the commission. And they point to a reference in the order to evidence that there were 21 carriers engaged in access stimulation. I'd like to bring the court's attention to paragraph 101 of the order, joint appendix 1318. The commission explains that reference to 21 carriers was meant to be illustrative. And the commission says at the end of paragraph 101, although this order cites illustrative examples of the types of traffic and the rules we adopt apply by their terms whenever they are triggered, without regard to the content or type of traffic, e.g., conference calling traffic or otherwise. Counsel, may I ask a question? Yes, Your Honor. How do you describe an access stimulator? What's the definition? An access stimulator is engaged in an arrangement with a high volume calling provider to stimulate terminating traffic in order to increase the access charge revenues that it is receiving. The six to one is the remedy that you came up with, right? But it doesn't, it doesn't, it does it. But what is the definition of the access stimulator? For purposes of applying these particular measures, the six to one was meant to be a screen dividing the access stimulator from other carriers that might have. So the six to one ratio is the definition of access stimulator. I thought as I read the order, I thought there was an implicit assumption that access stimulators were defined somehow otherwise, and six to one was a remedy to deal with them. Yes, that's right, Your Honor. So therefore, what was the definition of access stimulator before you came up with a six to one as the remedy? Well, the definition of access stimulator was to stimulate terminating traffic in order to artificially increase the access. But how high? How high? Well, that's where the six to one ratio. Well, no, but you see the thing that puzzles me is the 61, was the 61 the definition or the remedy? In other words, petitioner argues, you just decided the 21 guys, two and 21 companies were bad guys, and we're going to levy remedies to deal with them. But why were they the bad guys? How did you define them as bad guys? Well, the commission didn't actually speak to those 21 carriers in particular, but it talked about access stimulation practices, for example, in paragraph 45 of the order. In the past, access stimulation had been accomplished through these revenue sharing agreements. What the commission found after it adopted the 2011 rules, which prohibited access stimulation through revenue sharing agreements was that carriers were involved in other arrangements to try to stimulate access. For example, an access owned with a high volume calling service provider could retain the stimulated access revenues for itself while letting the high volume calling service provider operate at a loss. This was another way in which access stimulating carriers could work with high volume customers to stimulate access. Mr. Carr, I mean, you know, we use this term access stimulation, but I mean, and revenue generating given the FCC's existing regulatory scheme, right? So these companies are making a profit because of the rules that the FCC has set in place and the marketplace that they have created, which creates an incentive to make money in this way. So why is that because I think your honor, what, what the commission was pointing out was that these carriers are attempting to stimulate access to increase the access charge revenues into which that activity is lawful under the existing rules. Like there's nothing unlawful about what they're doing under the FCC's own rules. Isn't that correct? But the commission has made a decision in moving to bill and keep to get rid of these access charge subsidies. And the commission's view is that if these carriers are attempting to stimulate access to increase the number of subsidies they're getting, which are above costs. Counsel, isn't your answer to judge Raul that where you're not taking the position that prior practices were illegal, you're taking the position that they were unsound for economic reasons and therefore you want to change it, but you're not taking the position that prior practices were illegal. Well, we have found your honor that it was an unjust and unreasonable. I mean, they, they do, you're specifically acting under your authority to regulate what you say are unjust and unreasonable. That's a fair point. Even though, even though those practices are consistent with the just and reasonable rates that the commission has set. They are, but the commission, I'm not sure like what the gap is between, you know, why something is unjust and unreasonable. If it is in compliance with rates that the commission has set as being just and reasonable. Well, the commission has, has, is moving toward getting rid of these access charges because in fact, it has found that these subsidies are inconsistent with efficient competition, uh, under the communications act. And the commission points to that in, in paragraph 26 at J a 1287 competition suffers because access stimulation revenues subsidize the costs of high volume calling services, granting providers of those services, a competitive advantage over companies that collect such costs directly from their customers. The commission was trying to address this particular problem. It didn't seem fair to have these carriers working with their high volume customers and gaining an advantage over other conference calling companies by being able to subsidize their arrangements. And as they themselves acknowledge in, uh, in page 20 of their reply brief, they talk about their, their business model, free conferencing services are set up so that the conference is free to the organizer and each consumer pays its own long distance fees for the call. Essentially these, these services are being subsidized by the long distance carriers and their customers. And the commission believed that that was just, that was an unfair competitive practice. And given the fact that the commission is moving away from the access charge model, but it will ultimately transition to bill and keep for all carriers. It felt the need to take action now to prevent carriers from taking advantage of these access charges while they remain in effect by the access charges. You're including the basic access charge plus the transportation charge, plus the tandem switching. Is that correct? Yes, your honor access charges apply to various elements of, of the, there were, there were access charges for terminating end office switching. Those at this point have already moved to bill and keep forever. Uh, there are terminating tandem switching and transport charges. There are originating access charges and the commission in October of 2020 began to move at least some of those originating charges toward bill and keep and moved and started a three-year transition plan for originating charges related to a toll-free number services. The idea is, and the commission discusses this at a paragraph 100 of the order uh, on page J 1318 that this particular rule is part of an overarching approach to this problem. We're trying to move toward transition toward bill and keep, but we're moving in phases. And so the fact that some carriers are now uh, taking their own financial responsibility for some of these charges and others are not, is not inconsistent with reciprocal compensation ultimately, because the commission is moving toward a bill and keep regime where all carriers will be responsible for their own charges. I will point out for example, that price cap incumbent carriers as of July, 2018 are already on bill and keep for these terminating tandem switching and transport charges. So in that regard, does that mean under bill and keep will you're, there'll still be an access charge, won't there? Uh, no, there will not your honor that access charge at all. I'm not talking about transportation or tandem switching and so forth. Will there be no access charge at all? For bill and keep, there will be no access charge. The, the terminating carrier will recover its costs from its own end users. That's, that's the idea. I see. So the, so the limit, you'll eliminate all under bill and keep when you get there, there'll be no access charges at all. There will be no tariff access charges. Uh, now the, the petitioners pointed out in their reply brief and the commission agrees there could be access charges that are negotiated between the it's not tariffed. It's not, it's not related to the commission's overarching scheme of subsidizing service, subsidizing universal service, which has been part of the access charge regime from its beginning. Uh, and Congress is part of the 1996 telecommunications act directed the commission to move toward a more explicit subsidy system, anticipating that there would be free market competition in these local markets and that implicit subsidies would no longer work. And the commission is moving toward the commission's 2011 order addressing universal service and inter carrier compensation reform was designed to move toward that goal of, of eliminating implicit subsidies. All right. Any other questions from the panel? All right. Thank you, Mr. Carr. Um, Ms. Uh, Coppola, you, um, you were out of time, but we'll give you two minutes on rebuttal. Presiding judge. Wasn't there an intervener? There was, but I don't believe that the intervener requested argument time. Oh, I go. Thank you. Okay. Thank you, your honors. May I proceed? Yes, please. You heard this morning, uh, the FCC's council try to answer the question about what is, how is access stimulation defined? And we heard some, um, explanation of, of, of arrangements with high volume calling applications, but that is not the definition. The definition is set by statute or by regulation rather, but, uh, 47 CFR 61.3 BBB. And that is the definition that was amended in 2019. And that definition is this six to one ratio. So the six to one ratio is the actual definition of an access stimulant. That's right. And if you, you're a judge and if you fall under that six to one here, which again is targeted at a smaller carrier, right? You get, uh, penalized this. We've heard a lot about trying to move to billing, keep, try, try, try. We're going to get there. And that was something that the commission articulated in 2011. And instead of moving us to billing, keep where there is uniformity in each network, incurring the costs of sending calls on its own here, it's, it's asymmetrical it's buy and give away. If you get pegged with that six to one ratio, I may also point out that the six to one ratio, um, it's been, it's been applied so that anyone else caught in its net have been released. So as we all know, high volume calling is here to stay particularly post COVID. And recently the commission waived a urban, a large urban carrier who fell into the six to one net. Counsel, I don't think that is, I don't think that's properly before us. I know you cite the Amico case, but if you read the footnote on that case and the rest of the case, that was dicta and it was not the holding of the court. We, we have consistently taken the position that the events that take place after the rulemaking are not before us. If there's a facial challenge to the rulemaking, your honor, it is a, it is fact that we believe demonstrates the, we're not appealing the order where we are demonstrating a fact of the anti-competitive impact. It's a fact that, uh, was not brought before the FCC in this case because it couldn't have been, it happened afterwards and it's not before us. I believe your honor that the, the other cases that we cited in the 10th circuit demonstrate or provide precedent where the court can consider the facts that illuminate what the commission was doing here. All right. Thank you. Counsel, we have your
judges: Wilkins, Rao, Silberman